1  Makenzie Pauly and Faiza Pauly
   1840 41st St. STE 102-386
2  Capitola, CA 95010
   (831) 332-7413
3  paulytwo.0@gmail.com

4  Plaintiffs, pro se

*FILED*

*AUG 31 2018*

*SUSAN Y. SOONG*
*CLERK, U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF COURT*
*SAN JOSE CALIFORNIA*

5                  **UNITED STATES DISTRICT COURT**

6                 **NORTHERN DISTRICT OF CALIFORNIA**

7                          San Jose Division

8  Makenzie Pauly and Faiza Pauly          )   Case Number:
                                            )
9  Plaintiffs,                              )   **CV 18 5387**
                                            )
10        vs.                               )       **COMPLAINT**
                                            )
11 Stanford Health Care (Formerly known as  )                        **SVK**
   Stanford Hospital and Clinics)           )
12                                          )   **ADR**
   Defendant.                               )
13

14

15                                             **E-FILING**

16
   _____

17 **1. Jurisdiction** This court has jurisdiction over this complaint because it arises under the law of

18 the United States. Plaintiffs respectfully request that the court exercise supplemental jurisdiction

19 over state claims in this action, pursuant to 28 U.S.C. §1367, as 'they form part of the same case

20 or controversy.'

21 **2. Venue** Venue is appropriate because Defendant is located in this district and where events that

22 give rise to this lawsuit occurred.

23 **3. Intradistrict Assignment**   This lawsuit should be assigned to the San Jose Division of this

24 Court because the events that give rise to the lawsuit occurred in Santa Clara County.

25 **4. Related Cases**   This case is related to case number 10-CV-05582, filed in this district on

26 December 9, 2010, as defined by Local Rules of Civil Procedure (LRCP) for the Northern District

27 of California, Rule 3-12(a), in that it concerns "substantially the same parties, transaction or

28 event". However, according to Rule 3(b), it does not appear "likely that there will be an unduly

COMPLAINT      PAULY V. STANFORD HEALTH CLINICS

1  burdensome duplication of labor and expense or conflicting results if the cases are conducted

2  before different judges." The case was originally assigned to Judge Fogel and transferred to Judge

3  Illston of the San Francisco division when Judge Fogel was appointed to the Federal Judicial

4  Center in 2011. Judge Illston presided over two dispositive motions, previously filed under Judge

5  Fogel, by Defendant. These motions resulted in the dismissal of the case without prejudice until

6  the minor Plaintiff in the case reached the age of majority. Judge Illston did not review or decide

7  any of the merits of the case and therefore it is appropriate that it be assigned to the San Jose

8  division at the present time. Plaintiffs also respectfully submit the attached Motion for

9  Administrative Relief requesting permission to submit the attached Memorandum of Points and

10  Authorities in Support of Nonpatient Standing in EMTALA, as Plaintiffs seek to be in compliance

11  with FRCP Rule 11(b)(1) and (2), notwithstanding Judge Fogel's Order, Doc. #33.

12  **5. Plaintiffs**   Makenzie Pauly and Faiza Pauly

13  **6. Defendant**   Stanford Health Care

14  **7. EMTALA   42 USC §1395dd** The Federal Emergency Medical Treatment and Active Labor

15  Act (EMTALA) requires participating hospitals to provide the following:

16  **a. Medical Screening Exam (MSE)**

17  "In the case of a hospital that has a hospital emergency department, if

18  any individual (whether or not eligible for benefits under this subchapter)

19  comes to the emergency department and a request is made on the

20  individual's behalf for examination or treatment for a medical condition,

21  the hospital must provide for an appropriate medical screening

22  examination within the capability of the hospital's emergency

23  department, including ancillary services routinely available to the

24  emergency department, to determine whether or not an emergency

25  medical condition (within the meaning of subsection (e)(1)) exists."

26                                                          42 USC §1395dd(a)

27

28

COMPLAINT      PAULY V. STANFORD HEALTH CLINICS

**b. Stabilizing Treatment for known Emergency Medical Conditions (EMC)**

"Necessary stabilizing treatment for emergency medical conditions and labor (1) In general-If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either-(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with subsection (c)."

42 USC §1395dd(b)(1)(A)(B)

**c. On-Call Specialist**

"If, after an initial examination, a physician determines that the individual requires the services of a physician listed by the hospital on its list of on-call physicians (required to be maintained under section 1395cc(a)(1)(I) of this title) and notifies the on-call physician and the on-call physician fails or refuses to appear within a reasonable period of time, and the physician orders the transfer of the individual because the physician determines that without the services of the on-call physician the benefits of transfer outweigh the risks of transfer, the physician authorizing the transfer shall not be subject to a penalty under subparagraph (B). However, the previous sentence shall not apply to the hospital or to the on-call physician who failed or refused to appear."

42 USC §1395dd(d)(1)(C)

**d. Appropriate Transfers of Unstable Patients**

"An appropriate transfer to a medical facility is a transfer-

(A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health

COMPLAINT      PAULY V. STANFORD HEALTH CLINICS

1    and, in the case of a woman in labor, the health of the unborn child; (B)

2    in which the receiving facility-

3    (i) has available space and qualified personnel for the treatment of the

4    individual, and (ii) has agreed to accept transfer of the individual and to

5    provide appropriate medical treatment."

6                                    42 USC §395dd(c)(2)(A)(B)(i)(ii)

7    **8. Statement of Facts** On November 7, 2008, Makenzie Pauly (M. Pauly), then aged 10,

8    underwent exploratory abdominal surgery and an appendectomy at Sutter Memorial Hospital in

9    Sacramento, CA. Following the procedure, M. Pauly had uncontrolled pain that was different and

10   distinguished from the original pain which had resolved with the procedure. Unknown at the time

11   was that M. Pauly had a rare myotoxic reaction to the surgical anesthesia Bupivicaine. Following

12   the procedure and prior to discharge from Sutter, M. Pauly was recommended to Stanford Health

13   Care (SHC) for follow up with their Pediatric Pain Care Clinics and discharged with pain medicine.

14   M. Pauly's mother, Faiza Pauly (F. Pauly), made an appointment with the Pain Clinic for mid/late

15   January. On November 14, one week following surgery, F. Pauly took M. Pauly to SHC's

16   Emergency Department (ED) because the pain medicine was not working, and M. Pauly appeared

17   to be getting worse.

18        SHC medical records show that M. Pauly arrived with pain of '8' on SHC's pain scale of

19   1-10 (1 being no pain) and was listed with an 'Acuity' of '3-Urgent'. The Emergency Severity

20   Index (ESI) used by SHC is described by American Healthcare Research and Quality (AHRQ), a

21   U.S. Health and Human Services Agency, as "…a five-level emergency department triage

22   algorithm that provides clinically relevant stratification of patients into five groups from 1 (most

23   urgent) to 5 (least urgent) on the basis or acuity and resource needs." Level 1 patients require

24   "immediate lifesaving interventions," and "(f)rom a clinical standpoint, ESI level 4 and 5

25   patients are stable and can wait several hours to be seen by a provider."

26        M. Pauly was given a medical screening exam and treated for pain with Vicodin and

27   Morphine, given Zofran for nausea, and, after leaving the hospital, an antibiotic for a urinary

28   tract infection was called in to a pharmacy in Placerville, CA, where patient lived. While at

COMPLAINT        PAULY V. STANFORD HEALTH CLINICS

1   SHC's ED, M. Pauly's pain was brought down to a '5' on the pain scale and she said she felt

2   well enough to go home and wait for the appointment in January. Mother was given discharge

3   instructions to "Take Vicodin as prescribed as needed for severe pain. **Return to Emergency**

4   **Room if...you are experiencing unbearable pain not controlled with Vicodin**." (emphasis

5   added)

6          On December 4, 2008, M. Pauly was experiencing severe pain that was not controlled by

7   the Vicodin and F. Pauly took her to Sutter Hospital which was approximately one hour away as

8   opposed to SHC, which was approximately three hours away. Sutter provided M. Pauly with a

9   screening exam and admitted her to the hospital, in an attempt to find the source of, and control

10  the abdominal pain.

11         On December 7, Sutter medical records show that SHC's doctors were consulted and

12  agreed to take M. Pauly in transfer; "... STANFORD UNIV PAIN MGT FOR TRANSFER TO

13  INPT MGT- KATHLEEN LARKIN, MD. WILL ARRAGNGE FOR OK AND ADMIT AS

14  INPATIENT TO PEDS WARD FOR W/U." (original in capital letters) Approximately four hours

15  later the Sutter record states; "SPOKE AGAIN WITH PEDIATRICIAN DR. LIN AT LCPH

16  (Lucille Packard Children's Hospital). NO CURRENT BED AVAIL AT PEDIATRIC WARD.

17  SPOKE WITH DR. LARKIN WHO REC INITIATING GABAPENTIN RX WHILE HERE.

18  WILL ATTEMPT TRANSFER TOMORROW... SPOKE WITH MOTHER." (original in capital

19  letters).

20         On December 8, 2008, Sutter records again state, "Awaiting transfer to Stanford, Bed not

21  currently available...Transfer for inpatient pediatric pain svc management."

22         While 'waiting for a bed' at Sutter, in addition to the other medications, M. Pauly was

23  given an 'abdominal block' of Bupivicaine, administered with a ten-inch needle in several

24  abdominal locations while awake and being held down by several nurses. M. Pauly's mother was

25  present, trying to help her cope with the terrifying procedure and resulting increased pain. As this

26  was the medicine used in surgery, this procedure further deteriorated her condition and caused

27  severe emotional and mental anguish for both mother and daughter. Sutter records state, "...tried

28  injecting skin sites for trigger points which made things worse."

COMPLAINT        PAULY V. STANFORD HEALTH CLINICS

On December 10, 2008, Dr. Gates suggested F. Pauly F. Pauly call SHC and see if she, as a parent, could get them to 'find a bed.' F. Pauly called and was told they would return her call. While waiting for the phone call, M. Pauly began having a severe and disturbing reaction to the amount and combinations of medications and reported seeing 'double' and 'things moving on the walls." At this time, SHC called to notify Sutter doctors that the issue wasn't availability of beds, but rather that they had a rule of refusing to accept patients until they **"failed the outpatient clinic first."** (emphasis added)

Sutter records show, "It was felt that she would benefit from an inpatient referral to Stanford for their pain service, **but they refused admission unless she failed their outpatient pain management service."** (emphasis added). Sutter's doctors communicated that M. Pauly was in an unstable condition, and they were in fact making her condition worse. F. Pauly agreed and hearing that SHC had reversed its decision to accept M. Pauly in transfer, F. Pauly told Sutter doctors that she would be taking M. Pauly directly to SHC's Emergency Room as SHC had directed her to do when she was last there. Sutter discharged M. Pauly with paperwork to take to SHC.

After several days of 'waiting for a bed', being told there never was 'a bed', and watching her child's condition become desperate, F. Pauly drove two hours to take her daughter to SHC's ED. F. Pauly reasoned that the ED had told her to come back if the pain became worse, that SHC had specialized pediatric pain care, and that two SHC pediatricians had agreed M. Pauly needed inpatient care and had begun to treat M. Pauly while at Sutter in anticipation of her arrival at SHC, therefore, it was appropriate to take her daughter to SHC's ED for care. Nothing could have prepared F. Pauly for what she found upon arriving and having her daughter "seen" by Dr. Lipman.

Upon arriving at SHC, ED medical records show in part: triage 'Acuity' level was '2-Emergent', pain level was a 10/10, vitals were unstable, and morphine injection given.

Dr. Lipman, attending physician states, "Last week she has an umbilical nerve block was done (sic) and the pain has been worse since...She was discharged today and came straight to the Stanford ED with continued uncontrolled pain. Pain is currently rated at a 10/10. The patient says she is unable to walk 2/2 pain...She appears distressed. **Crying out in pain."** (bold in original.)

COMPLAINT      PAULY V. STANFORD HEALTH CLINICS

1       When attending resident, Dr. Heather Murdoch, was told by patient's mother that Dr. Lin,

2   Dr. Larkin and Dr. Mosely had agreed to accept M. Pauly in transfer and then the transfer had been

3   revoked due to the "outpatient rule" she refused to see the Sutter records sent with Plaintiffs and

4   left the room. When she returned she stated that M. Pauly would not be admitted and would not

5   be treated in the ED. Dr. Lipman, the attending physician was very angry when F. Pauly requested

6   he call Dr.'s Larkin, Lin or Mosely and he refused to do so. Dr. Lipman left the room to contact

7   the on-call specialists and returned saying they would not come in to examine M. Pauly. SHC

8   records show: "Services Consulted: **LPCH pediatrician; pain svc.**" Dr. Lipman notes in the

9   record under "Consult Comments", **"Call pain team, see range of treatment offer and this may**

10  **dictate treatment. Pain svc says will not admit/consult unless medically indicated or seen as**

11  **outpatient first. No admission per LPCH hospitalist."** (bold in original)

12      Dr. Lipman insisted "patient had good follow up in the am" referring to a Gastrointestinal

13  ("GI") clinic appointment that F. Pauly had repeatedly communicated had been cancelled the

14  previous week at (Sutter surgeon) Dr. Gates' direction. F. Pauly requested to speak to a patient

15  advocate to which Dr. Lipman replied, "After that, that's it!". Patient representative Jenny Booth

16  was called to the room but was unable or unwilling to act on M. Pauly's behalf. Colleen O'Conner,

17  childcare specialist, who had earlier come to speak with family was no longer available. Nurses

18  followed Dr. Lipman's order and removed the IV and brought discharge papers. F. Pauly urged

19  that M. Pauly be stabilized for the night as they lived three hours away and so they could try and

20  talk to the SHC doctors, who had treated M. Pauly by phone while she was at Sutter, in the

21  morning. All requests were refused.

22      F. Pauly refused to sign discharge papers because M. Pauly was so unstable. All nurses and

23  doctors left the room and F. Pauly, fearing security would be called, had to physically pick up M.

24  Pauly, put her into the wheelchair and then put her in her car. As F. Pauly and her sister struggled

25  to put M. Pauly, crying in pain, into the back seat, two paramedics ran to offer a gurney, thinking

26  Plaintiffs were arriving for care instead of leaving. While driving away from the ED, M. Pauly was

27  in a state of panic, crying and asking who was going to help her. The entire time waiting at Sutter

28  and then driving over two hours to SHC, F. Pauly told her daughter that she had to be brave and

COMPLAINT      PAULY V. STANFORD HEALTH CLINICS

1   patient and they just had to make it to Stanford where they had special doctors who could help her.

2   Now, being personally and publicly rejected and repeatedly refused care for almost four hours, M.

3   Pauly was inconsolable.

4        After being rejected by SHC on December 10, 2008, F. Pauly had no other resources

5   available to care for M. Pauly's severe pain. The pain killers originally sent home with M. Pauly

6   were stopped because they had no effect on the pain. Hospitals without specialized services were

7   unable to help and in fact caused more damage. SHC refused to provide specialized care until M.

8   Pauly "failed outpatient clinic". F. Pauly called the outpatient clinic to request an earlier

9   appointment, but the clinic was unable to accommodate the request. Afraid to cause further damage

10   at another facility, Plaintiffs were forced to wait the six weeks until the time of the original

11   outpatient appointment. During this time, M. Pauly continued to be unstable and experience

12   excruciating pain. F. Pauly sought out complementary and alternative sources to help her daughter

13   cope with her condition and continued to search for the cause of the pain. Finally, after carefully

14   reviewing Sutter's surgical records and researching all the medications and procedures for possible

15   causes, F. Pauly became aware of rare occurrences in which the surgical anesthesia, Bupivicaine,

16   caused myotoxic reactions in a small percentage of patients. A small case study showed that the

17   toxic damage could possibly be reversed with treatment of a topical medication. F. Pauly obtained

18   the medication and over several days the pain resolved. This occurred a couple of days prior to the

19   scheduled SHC outpatient clinic appointment in January. F. Pauly contacted Dr. Gates, the surgeon

20   who performed the surgery and abdominal block, who confirmed that although rare, his research

21   showed that in a minority of patients, this toxic reaction does occur.

22        Plaintiffs were personally injured as a direct result of: SHC's refusal to accept M. Pauly in

23   transfer from Sutter where her condition further deteriorated; SHC's refusal to provide a medical

24   screening exam; SHC's refusal to provide stabilizing medical treatment, and; SHC's dumping of

25   M. Pauly. Consequently, Plaintiffs spent six weeks in torment, as they were left to deal with M.

26   Pauly's unstable condition alone, waiting for the outpatient clinic as required by SHC. Dealing

27   with the excruciating pain, and not knowing at the time, whether the pain was caused by a life-

28   threatening condition, caused them severe physical, mental and emotional distress.

COMPLAINT      PAULY V. STANFORD HEALTH CLINICS

1  9. CAUSES OF ACTION-A) EMTALA VIOLATIONS, and/or (B) NEGLIGENT

2  INFLICTION OF EMOTIONAL DISTRESS, and/or (C) INTENTIONAL INFLICTION

3  OF EMOTIONAL DISTRESS, and /or (D) ABUSE OF PROCESS

4  <u>**A. EMTALA VIOLATIONS**</u>

5      Defendant SHC knowingly and intentionally, refused to provide emergency medical care

6  for plaintiff, M. Pauly, in five (5) separate violations of EMTALA. As a direct result of such

7  violations, both Plaintiffs suffered harm: M. Pauly suffered severe physical pain and she and her

8  mother, F. Pauly, present at the time, suffered severe mental and emotional distress.

9  **FIRST CAUSE OF ACTION:**

10  **REVERSE DUMPING-FAILURE TO ACCEPT PATIENT IN TRANSFER**

11      EMTALA requires participating hospitals to accept a patient in transfer if it has specialized

12  capabilities and capacity at its facility. SHC first agreed to accept M. Pauly in transfer, began

13  treating her in anticipation of her arrival, then dumped her in compliance with SHC's policy

14  requiring "outpatient clinic failure". In *St. Anthony Hospital v U.S. Dept. of HHS*, the 10th Circuit

15  addressed "reverse-dumping":

16          "'Reverse-dumping' occurs when a hospital emergency room refuses to

17          accept an appropriate transfer of a patient requiring its specialized

18          capabilities...In 1989, Congress imposed a corresponding duty on

19          participating hospitals to accept 'appropriate' transfers... This action

20          came after a House of Representatives committee report found a

21          disturbing number of instances in which it is necessary to transfer a

22          patient from one hospital emergency room to another because the

23          patient's condition requires a level of care which that hospital is

24          unequipped to provide or because there is no physician available there

25          who can adequately treat the patient. But often ... the second hospital

26          refuses to accept the transfer and treat the patient...Under 42 U.S.C. §

27          1395dd(g), EMTALA's 'nondiscrimination' provision, a participating

28          hospital is required to accept an 'appropriate' transfer of an individual

COMPLAINT      PAULY V. STANFORD HEALTH CLINICS

1    requiring its specialized capabilities or facilities, so long as the hospital

2    has the capacity to treat the individual." (citations omitted)

3        *St. Anthony v. U.S. Dept. HHS* 309F.3d 680 (10th Cir. 2002) 1,43,44,45

4        SHC provides several online resources describing its Inpatient Pain Management and

5    Consultation Service and Transfer Center policies and how to access care when needed. According

6    to these, MP was treated discriminately and in violation of SHC's stated procedures.

7    IN PATIENT SERVICES

8        SHC's Inpatient Pain Management and Consultation Service webpage

9    (https://www.stanfordchildrens.org/en/service/pain-management/services) directs both parents

10   and healthcare providers on how to refer patients and states, "The Inpatient Pain and Symptom

11   Management Service provides consultation to hospitalized patients who are experiencing pain

12   secondary to a variety of illness or treatment factors (including):..Pain following surgery."

13   PATIENT TRANSFER CENTER

14       Regarding SHC's specialized Patient Transfer Center, information found in the Center's

15   brochure and webpage (captured March 15, 2011), assures patients that it complies with

16   EMTALA, and states in relevant part, the following:

17   **Transfer Center Services**-Physician consultation, trauma patients and emergent transfers are

18   accepted 24 hours a day.

19   **"One Phone Call" Advantage**-To access Stanford's Hospital & Clinics (SHC) complete line of

20   Specialty inpatient services, the physician need only call the Stanford Transfer Center. Our

21   Communication Specialist will request a transfer to Stanford Hospital and Clinics…

22   **Transfer Center Process at SHC-**

23   1. A hospital representative or physician calls the Transfer Center expressing interest in

24   transferring a patient to Stanford Hospital and & Clinics.

25   2. The Communications Specialist at SHC Communications Center will locate the appropriate

26   SHC physician and facilitate a recorded conference call between the referring and accepting

27   doctors to determine a preliminary clinical evaluation.

28

COMPLAINT        PAULY V. STANFORD HEALTH CLINICS

3. Admission of emergent patients accepted by a physician will be facilitated into SHC with the assistance of the Transfer Center nurse. **The Transfer Center policies and guidelines are designed to adhere to EMTALA regulations and to facilitate the request in the fastest manner possible.** (emphasis added)

By its own admission, SHC had policies that comply with EMTALA and provided for the acceptance of emergent patients at the request of referring doctors, yet, M. Pauly was denied a transfer in violation of SHC's own policies and EMTALA regulations.

SHC told Sutter doctors, it was not a "bed" (lack of capacity) but rather SHC's requirement that patients "fail the outpatient clinic" prior to being accepted to its specialized pediatric services. This outpatient rule was reiterated by Dr. Murtaugh, Dr. Lipman, the on-call pain specialists, the ED nurses, and patient representative, Jenny Booth. Sutter doctors did not have the necessary specialized capability to stabilize M. Pauly's condition but made that condition worse, by being forced to "treat her" for days, while SHC fraudulently continued to state it was looking for a bed, presumably hoping M. Pauly would go elsewhere.

CAPACITY

EMTALA requires hospitals to accept patients when it has the capabilities and capacity to do so. SHC can provide information of its census on the days it rejected M. Pauly's transfer, however, EMTALA Interpretive Guidelines state, "Capacity includes whatever a hospital customarily does to accommodate patients in excess of its occupancy limits §489.24(b). If a hospital has customarily accommodated patients in excess of its occupancy limits by whatever mean (sic)...it has, in fact, demonstrated the ability to provide services to patients in excess of its occupancy limits." (State Operations Manual Appendix V, Responsibilities of Medicare Participating Hospitals in Emergency Cases, rev 60, 07-16-10, p48)

In addition to capacity at the main hospital, SHC had at its disposal an offsite inpatient pediatric unit in Mountain View, CA. The SHC webpage states, "Lucile Packard Children's Hospital Stanford partners with El Camino Hospital in Mountain View to provide inpatient care for pediatric patients. The Packard at El Camino (PEC) Unit is a 24-bed satellite unit of Lucile Packard Children's Hospital Stanford." SHC posted online, an *Expanded Diagnosis List for*

COMPLAINT     PAULY V. STANFORD HEALTH CLINICS

1  *PEC*, stating, "To assist with patient placement, we have created a list of admission diagnoses
2  that can be effectively managed at PEC…" The list includes, under General Pediatrics, "Pain
3  management" to ascertain whether SHC had capacity to accept M. Pauly on the dates in
4  question, census at both facilities will have to be determined.

5        SHC consistently stated two conflicting justifications for why M. Pauly was not accepted
6  in transfer: 1) No beds available, and 2) Policy requiring failure at outpatient clinic. SHC's Director
7  of Pediatric Emergency Medicine for Lucile Packard Children's Hospital (LPCH), Dr. Bernard
8  Dannenberg, responded to F. Pauly's complaints with a letter dated January 23, 2009, stating, "The
9  LPCH explained that there were no beds available for admission." However, in a letter dated
10 March 17, 2009, an attorney in SHC's Risk Management Department, Shira Mowlem, Esq., in a
11 clear attempt to avoid EMTALA's capacity provision, stated, "…the transfer request initiated by
12 Sutter…was denied based upon clinical information." With this additional excuse, SHC has
13 effectively provided three conflicting justifications for rejecting M. Pauly's transfer, ratifying its
14 action of reverse patient dumping according to EMTALA.

15                    **SECOND CAUSE OF ACTION:**
16 **FAILURE TO PROVIDE AN APPROPRIATE MEDICAL SCREENING EXAM (MSE)**
17 **Medical screening requirement**
18              "In the case of a hospital that has a hospital emergency department, if
19              any individual…comes to the emergency department and a request is
20              made on the individual's behalf for examination or treatment for a
21              medical condition, the hospital must provide for an appropriate medical
22              screening examination within the capability of the hospital's emergency
23              department, including ancillary services routinely available to the
24              emergency department, to determine whether or not an emergency
25              medical condition (within the meaning of subsection (e)(1)) exists."
26                                        42 USC §1395dd(a)
27        In *Munoz v. Watsonville* No.15-00932, 2017BLF, this court looked to the following cases
28 regarding Medical Screening Exams required by EMTALA; *Hoffman v. Tonnemacher*, 425

COMPLAINT      PAULY V. STANFORD HEALTH CLINICS

1   F.Supp.2d 1120, 1130 (E.D. Cal. 2006); *Moore v. Tri-City Hosp. Found.*, Case No. 13-0341, 2013

2   WL 2456027, at *2 (S.D. Cal. June 6, 2013), *Jackson v. Eastbay Hospital* 246 F.3d 1248, 1256

3   (9th Cir. 2001) and held:

4            "EMTALA requires hospitals to conduct an examination that is

5        reasonably calculated to identify the patient's critical medical condition.

6        EMTALA also protects an individual from receiving a screening different

7        from other individuals presenting with the same or similar conditions at

8        that hospital. As the Southern District of California stated:

9        [A] hospital satisfies EMTALA's 'appropriate medical screening'

10       requirement if it provides a patient with an examination comparable to

11       the one offered to other patients presenting similar symptoms, unless the

12       examination is so cursory that it is not 'designed to identify acute and

13       severe symptoms that alert the physician of the need for immediate

14       medical attention to prevent serious bodily injury. [F]aulty screening, in

15       a particular case, as opposed to disparate screening or refusing to screen

16       at all, does not contravene the statute. In short, EMTALA is an equal

17       access statute that imposes no quality of care standards on hospitals."

18       (internal citations and quotations omitted.)

19                                *Munoz v. Watsonville*, Doc 91*5¶2

20            SHC's medical records printed on May 29, 2009, show in part as follows:

21   M. Pauly visit to SHC's ED on Dec. 10, 2008 lasted less than 4 hours from 5:16pm to 9:10pm.

22   5:16    Arrival-Triaged as "2-Emergent"

23   5:24    Pain level 10/10. First (of three) vitals-Unstable

24   5:46    Morphine Injection given by Nurse Jessica Johnston (authorized by Dr. Murtaugh prior to

25   seeing M. Pauly)

26   6:12    "Analgesic as ordered, ER Resident in to assess, labs drawn and sent" per Nurse Johnston.

27   6:45    Note time of Dr. Grant Lipman's entry of his assessment of M. Pauly.

28

COMPLAINT        PAULY V. STANFORD HEALTH CLINICS

1    In a 33-minute span of time, from 6:12pm, when Dr. Murtaugh came in to assess, to 6:45pm when

2    Dr. Lipman began charting notes, two doctors "examine" the patient, had time to page and discuss

3    the case with two on-call specialists (Lucille Packard Children's Hospital pediatrician, and a pain

4    specialist), and return in time to start charting notes. This 33-minute time lapse does not constitute

5    an 'appropriate medical screening exam' as required by EMTALA.

6          Both Dr.'s Murtaugh and Lipman were visibly angry that F. Pauly had come to the ED

7    seeking emergency care for M. Pauly and retaliated by immediately determining that M. Pauly

8    would not be seen until she had "obeyed" and followed the rule of "failing the outpatient clinic"

9    before receiving any care at SHC. When Special Patient Representative Mike Granneman called

10   F. Pauly in response to her concerns regarding the ED visit, he replied, "This makes me so angry!

11   He's done this before!" on hearing about Dr. Lipman's behavior.

12         Either SHC has a written policy stating that all pediatric patients who come to the ED with

13   abdominal pain are denied care until they fail the outpatient clinic, or M. Pauly was treated

14   differently and denied care while others received an appropriate medical screening exam.

15         In 2007, the E.D. Cal. Court stated,

16              "…failure to provide any screening, the provision of a 'cursory

17              screening' that amounts to no screening at all in that it is not designed to

18              detect acute and severe symptoms, and disparate treatment such as the

19              hospital's failure to follow its own screening procedures, may all

20              constitute a breach of the hospital's duty to provide an appropriate

21              medical screening to a patient seeking emergency treatment. *See* 42

22              U.S.C. § 1395dd(a); *Bryant*, 289 F.3d at 1166; *Baker*, 260F.3d at 994-95;

23              *Jackson*, 246 F.3d at 1256; *Correa*, 69 F.3d at 1192-93; Eberhardt, 62

24              F.3d at1258-59."

25                              *Romar v. Fresno* No 03-06668-AWI Doc 135 *14¶3

26         This court likewise addressed a hospital's dismissive behavior regarding screening in

27   *Munoz*, where it held, "The *Correa* court found that the hospital's delay in attending to the patient

28

COMPLAINT    PAULY V. STANFORD HEALTH CLINICS

1   was so egregious as to amount to an effective denial of a screening examination." *Id.* *7¶2 (citing

2   *Correa v. Hosp. San Francisco,* 69 F.3d 1184,1192(1st Cir.)(1995))

3          Similarly, here, SHC's 33-minute doctor shuffle, amounted to an outright denial of

4   screening.

5          SHC's stated policy regarding ED pediatric patients was highlighted in its online

6   publication, *Accolades,* "Few experiences are more frightening then being the parents of a

7   seriously ill or injured child and feeling desperate to reach medical facilities." It continues to

8   promote the new pediatric emergency department under Dr. Bernard Dannenberg, "Dr.

9   Dannenberg and his team have transformed the pediatric service with such advances as

10  streamlined registration and quick triage, the addition of Child Life Specialist to ease children's

11  fears, and formation of the 'ouchless ED' with rapid pain assessment and the use of kid-friendly

12  topical anesthetics, (and) specially formulated pain medications..."(vol.10, No.2 Fall 2010)

13  Clearly, this was not the ED experience offered to Plaintiffs on Dec. 10, 2008. For M. Pauly,

14  severe pain, the presenting symptom, did not warrant a medical screening exam, although SHC

15  had clearly told Plaintiffs, in written discharge instructions at the November 14, 2008, ED visit,

16  **"Return to the Emergency Room if...you are experiencing unbearable pain uncontrolled**

17  **with Vicodin."** (emphasis added) It was obvious that M. Pauly was being punished because her

18  mother had brought her to SHC after being denied transfer while at Sutter.

19         Additionally, SHC has an advertised policy on its online pediatric ED website, stating,

20  "All patients receive care from team members who specialize in caring for children...(and)...

21  high level care in all pediatric specialties..." However, M. Pauly's attending physician, Dr.

22  Lipman, was not specialized in pediatric care but rather Wilderness Medicine. While at SHC's

23  ED, Plaintiffs never saw a pediatrician or a pain (or other) specialist.

### THIRD CAUSE OF ACTION:

### FAILURE TO PROVIDE ON-CALL SPECIALISTS

26         While EMTALA does not provide a private cause of action against doctors, the statute

27  holds hospitals responsible, and on-call specialists personally responsible, if the specialist refuses

28  to come to the ED to examine a patient needing specialized services.

COMPLAINT        PAULY V. STANFORD HEALTH CLINICS

1    "If, after an initial examination, a physician determines that the individual requires the services

2    of a physician listed by the hospital on its list of on-call physicians (required to be maintained

3    under section 1395cc(a)(1)(I) of this title) and notifies the on-call physician and the on-call

4    physician fails or refuses to appear within a reasonable period of time…the physician authorizing

5    the transfer shall not be subject to a penalty under subparagraph (B). However, the previous

6    sentence shall not apply to the hospital or to the on-call physician who failed or refused to

7    appear." 42 USC 1395 dd(d)(1)(C).

8        SHC's medical record states, per Dr. Lipman, "Services Consulted: **LPCH pediatrician;**

9    **pain svc.** Consult Comments: **Call pain team, see range of treatment offer(sic) and this may**

10   **dictate treatment. Pain svc says will not admit/consult unless medically indicated or seen as**

11   **outpatient first. No admission per LPCH hospitalist.** (bold in original, emphasis added)

12       On Dec. 10, 2008, SHC contacted two on-call specialists who refused to come to the

13   hospital and consult on whether M. Pauly had an emergency medical condition. SHC states

14   regarding their Pediatric Emergency Medicine; "Children need specialized care, especially during

15   an emergency. At the Stanford Department of Pediatric Emergency Medicine, we understand that

16   children are not small adults, and we strive to create an environment of comfort. As a Level I

17   Pediatric Trauma Center, we offer **comprehensive 24-hour emergency care that includes direct**

18   **access to world-ranked pediatric specialists**." (emphasis added)

19   (http://emed.stanford.edu/pediatric-ed.html)

20       Interpretive Guidelines reiterate, "Although the on-call requirement is found in Section

21   1866…the EMTALA section of the Act, provides for enforcement actions against both a physician

22   and a hospital when a physician who is on the hospital's on-call list fails or refuses to appear within

23   a reasonable period of time after being notified to appear." (State Operations Manual p30) Access

24   to "pediatric specialists" was denied to M. Pauly as specialists refused to appear when called.

25                          **FOURTH CAUSE OF ACTION:**

26   **FAILURE TO TREAT A KNOWN MEDICAL EMERGENCY CONDITION (EMC)**

27       Despite SHC's refusal to provide an appropriate MSE, M. Pauly's emergency medical

28   condition of severe pain was known. Medical records clearly record this knowledge: pain noted as

COMPLAINT    PAULY V. STANFORD HEALTH CLINICS

1  "10/10", pt "crying out in pain", "unable to walk 2/2 pain", morphine was administered prior to

2  doctor assessment, vitals were unstable, "appears distressed", "had a procedure which made the

3  pain worse."

4       Although EMTALA confers no responsibility on hospitals that do not detect an EMC, once

5  an EMC is known, the hospital has a legal obligation to treat that condition until the patient is

6  stabilized. Plaintiffs do not claim that SHC misdiagnosed M. Pauly's condition or that they failed

7  to diagnose the cause of severe pain. SHC, in fact, provided no diagnosis at all. Regardless, SHC

8  was still responsible to treat the condition of severe pain that *was identified*. In *Munoz*, this court

9  stated; "In this case, although it is undisputed that WCH failed to diagnose the conditions that

10  caused Ms. Hermosillo's death, **it did identify severe pain as a certified medical condition and**

11  **thus it did have a duty to stabilize that condition.**" *Id,* *9¶4 (emphasis added)

12       SHC has a clear policy of treating pediatric pain. In the *Accolades* article above, Pediatric

13  ED director, Dr. Dannenberg, states, "The overarching goal of our department is to treat every

14  child with the proper and appropriate pain management techniques." In a welcome letter posted

15  online and directed at residents joining the new Pediatric ED, Dr. Dannenberg states, "Caring for

16  Kids in Our Emergency Department: Our Philosophy, #1 Kids are always a priority in the ED…

17  #2 **Try to Avoid Pain… #3 Try to Treat Pain-Even if the Child does not complain about pain,**

18  **try to offer pain medications for a painful condition.**" The records clearly show that other than

19  the initial care given during triage, M. Pauly did not receive any care, including having her vitals

20  taken, for the last three hours at the ED. In refusing to treat M. Pauly's known condition of severe

21  pain, SHC discriminately denied M. Pauly "proper and appropriate pain management" in violation

22  of SHC's publicly stated Emergency Pediatric pain management policy.

23                        **FIFTH CAUSE OF ACTION:**

24       **FAILURE TO PROPERLY TRANSFER A PATIENT WITH A KNOWN EMC**

25       Regarding transfer or discharge, EMTALA Interpretive Guidelines state, "The medical

26  record must reflect continued monitoring according the individual's needs until it is determined

27  whether or not the individual has an EMC and, if he/she does, until he/she is stabilized or

28

COMPLAINT       PAULY V. STANFORD HEALTH CLINICS

1    appropriately transferred. **There should be evidence of this ongoing monitoring prior to**

2    **discharge or transfer,"** (emphasis added) (State Operations Manual, p.36)

3           And "The EMC that caused the individual to present to the dedicated ED must be resolved,

4    but the underlying medical condition may persist." *(Id, p.50)*

5    SHC discharged M. Pauly with a known emergency medical condition of severe pain. When

6    Plaintiffs were told M. Pauly would receive no care, her mother requested some form of advocacy,

7    pleading to have access to the doctors who agreed to treat M. Pauly and stressing that she had no

8    way of caring for her daughter and SHC had specialized care that could help, even if it was only

9    for the night, but all requests were denied. Finally, out of frustration, and in a blatant and

10   transparent attempt to feign EMTALA compliance, Dr. Lipman fraudulently states in the medial

11   record: **"Stable 8:17 PM"** under "Patient progress and condition on discharge." Dr. Lipman

12   additionally states: **"Discussed with mother, perseverating on need for admission, requesting**

13   **patient advocate Special patient services contacted to discuss with mother."** (bold in original)

14          Stedman's Medical Dictionary defines "Perseveration" as "Uncontrolled repetition of a

15   particular response, such as a word, phrase, or gesture, despite the absence or cessation of a

16   stimulus, usually caused by brain injury or other organic disorder." Dr. Lipman was obviously

17   furious at Plaintiff for continuing to plead for help.

18          According to EMTALA guidelines, proving a patient was stable at the time of transfer is the

19   participating hospital's responsibility. "If a hospital is alleged to have violated EMTALA by

20   transferring an unstable individual without implementing an appropriate transfer according to

21   §489.24(c), and the hospital believes that the individual was stable (EMC resolved) **the burden**

22   **of proof is the responsibility of the transferring hospital."** State Operations Manual, p51

23   (emphasis added)

24          Dr. Lipman was unable to provide supporting documentation regarding Plaintiff's claimed

25   "stability". Nothing in the records indicate the pain had decreased, or M. Pauly was

26   stable in any way. On the contrary, M. Pauly was still in the same condition of severe pain recorded

27   several times in the medical record as, "Pain of 10/10". This refusal to treat a known medical

28   condition was addressed in *Munoz*, where regarding severe pain at discharge, the court held:

"...Ms. Hermosillo 'was discharged to home by nursing personnel upon Dr. Kaplan's order' despite remaining in significant pain, and her pain level was still 8 out of 10 when she was discharged...the allegations are sufficient to support Plaintiff's claim that WHC at least had a duty to stabilize the identified certified medical condition, and that Ms. Hermosillo was not in a stable condition regarding severe pain when she was discharged...Provided that this cause of action specifically relates to WHC's duty to stabilize 'severe pain,' the Court finds this cause of action adequately alleged." *Id* *9¶4

SHC has a specialized unit designed for cases that are not deemed appropriate for inpatient care and yet not stable for discharge, called the Clinical Decision Area (CDA) This unit was highlighted in the online publication, *Stanford Medicine News Center* on January 13, 2009, a month after Plaintiffs December ED visit. SHC's 11 bed CDA was established in 2006 and is described as follows: "CDAs are designed as 23-hour diagnostic and treatment units for low- to moderate-risk patients who are too sick to be sent home, but not sick enough to be admitted to the hospital...perhaps they're suffering from an asthma attack, back pain, gastroenteritis, alcohol intoxication, allergic reactions, hypertension or transient ischemic attacks." Despite F. Pauly's continued requests that M. Pauly be allowed to stay for the night, this request for care, as all others, was denied. M. Pauly knew, leaving the ED, that SHC had a special hospital just for children, special children's pain doctors, and doctors who wanted to take care of her, but for some reason, unknown to her, she was being rejected and sent away in pain, and that there was now no one who could help her.

## B. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### SIXTH CAUSE OF ACTION

### M.PAULY-NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

As a result of Defendant's breach of duty, and careless disregard, M. Pauly suffered severe emotional distress related to each of the previously stated EMTALA violations. Any common person could foresee that refusing to accept in transfer, and instead leaving a medically

COMPLAINT        PAULY V. STANFORD HEALTH CLINICS

1   unstable child in a facility that did not have the capability to treat her, would cause her emotional

2   distress. Any common person would also foresee that when that child came to the Emergency

3   Department seeking stabilizing care, it would cause her emotional distress to deny her care.

4   Furthermore, it would cause her emotional distress to refuse to provide stabilizing medical care

5   to treat her obvious condition of severe pain. Any common person would also foresee that

6   denying that child specialized pediatric pain management, which was available by on-call

7   specialists, would cause emotional distress. It was obviously foreseeable that discharging a ten-

8   year-old child, weighing only fifty-seven pounds, who had not recovered from abdominal

9   surgery a month prior, and with an unstable medical condition, to her home, three hours away, in

10  the care of a non-physician parent, to wait six weeks for an outpatient appointment, would cause

11  further severe emotional distress. Defendant knowingly and willfully, acted in a manner which

12  directly injured M. Pauly beyond the physical pain she suffered.

### SEVENTTH CAUSE OF ACTION

### F. PAULY-NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS: BYSTANDER

16      As a result of Defendant's negligent EMTALA violations stated above, F. Pauly suffered

17  severe emotional distress as a bystander, watching her child suffer at the hands of Defendant's

18  repeated foreseeable injurious actions. She was present with her child at every event and was

19  unable to stop the actions which occurred over several days. Furthermore, as a responsible

20  parent, F. Pauly had followed all the instructions given to her, had provided sufficient medical

21  insurance, and had clearly communicated with Defendant and pleaded with them to stop the

22  behavior. However, nothing F. Pauly did could protect her daughter from Defendant's negligent

23  actions or provide the emergency care she needed, as a result, F. Pauly suffered severe emotional

24  distress. (*see Dillon v. Legg* 68 Cal.2d 728 (1968))

### EIGTH CAUSE OF ACTION

### F. PAULY- NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS: DIRECT VICTIM

28

COMPLAINT        PAULY V. STANFORD HEALTH CLINICS

1    In beginning to care for M. Pauly while she was at Sutter Hospital, and promising to

2   accept her in transfer for further care, Defendant offered a service which Plaintiff, F. Pauly,

3   accepted and relied upon through the physicians at Sutter. After four days of reliance on such

4   offer, Defendant rescinded it, stating it never intended to admit her daughter, and was in fact

5   prohibited from accepting her into the specialized inpatient pain management program due to the

6   outpatient failure rule. Furthermore, after driving two hours to Defendant's Emergency

7   Department, Plaintiff signed papers that stated she would assign insurance benefits to Defendant

8   in exchange for emergency medical care and would personally assume financial responsibility

9   for any charges not covered by the benefit provider. Plaintiff was given information in a

10   pamphlet entitled, "Your Rights and Responsibilities as a Patient," governing the rights and

11   responsibilities of such an agreement. The pamphlet stated in part. "You have the right to…have

12   all patients' rights apply to the person who has legal responsibility to make decisions regarding

13   medical care on your behalf…participate actively in decisions regarding medical

14   care…appropriate assessment and management of pain… receive care in a safe setting, free from

15   verbal or physical abuse, harassment or exploitation… considerate and respectful care."

16    However, after Defendant offered medical care to her daughter, obtained insurance

17   benefit assignment and the promise of financial compensation in exchange for such offer,

18   Defendant refused to provide any medical care to her daughter, despite the obvious severe pain

19   she was suffering. As the primary caretaker of her child, Plaintiff was left alone to shoulder the

20   burden of her child's emergency medical care and that child's mental, emotional and physical

21   injuries resulting from Defendant's actions. Plaintiff, F. Pauly, was a direct victim of Defendant

22   egregious and reckless conduct. Defendant knew its actions would result in injury, and yet

23   continued over many days, first remotely, and then personally, to deny emergency medical care

24   to her unstable child, causing Plaintiff to suffer prolonged, severe mental, and emotional distress

25   as a result. Both mother and daughter were traumatized by the Defendant's actions and were

26   forced to wait the six weeks until the outpatient clinic. (*see Andalon v. Superior Court*, 162 Cal.

27   App. 3d 600 (Cal. Ct. App. 1984)

28   **C. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

COMPLAINT      PAULY V. STANFORD HEALTH CLINICS

**NINTH CAUSE OF ACTION**

**F. PAULY-INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS: FRAUD**

Defendant not only repeatedly offered services for medical care to Plaintiff, but it publicly advertised extensive and detailed services in print and online publications as noted above. Plaintiffs, as well as the physicians at Sutter, relied upon those services and found that they were not available until Plaintiff, M. Pauly, participated in, and failed, the required outpatient clinic program. This requirement, forcing Defendant to deny care, was the direct result of a financial scheme designed to increase funding to underperforming outpatient clinics. SHC and the School of Medicine (SoM) developed a new "Funds Flow Model" that outlined among other things, the source of funding for physician bonuses and a plan for outpatient clinic "financial viability". The plan was detailed in a Dean's Letter (Dean Phillip Pizzo, SoM 2001-2012) dated February 22, 2005, "…it better aligns the incentives of the hospital and faculty physicians, provides better financial predictability and stability, and improves the prospect for outpatient practices to achieve financial viability."

*http://deansnewsletter.stanford.edu/archive/02_22_05.html#1*

The SoM's Directors of Finance and Administration (DFA), made the case for change, **"Professional revenue alone cannot support the high cost of ambulatory (outpatient) expenses…Departments are unable/unwilling financially to grow unprofitable outpatient practices even if it would be profitable for the overall clinical enterprise."** (*Id.* at Funds Flow Model) (emphasis added)

Defendant, SHC, was tasked with implementing the new model, "In the new model, SHC would operate the inpatient and outpatient facilities, manage the revenue cycle, and pay the School (and hence faculty) for the professional services being delivered." More importantly, the plan promised financial incentives, "An appropriate gain-sharing methodology will be developed." *(Dean's Newsletter 2/22/05)* 'Gainsharing' is defined as; "A financial collaboration between hospitals and health care professionals in which the parties agree to divide any benefits they achieve from increases in productivity of receipts or from decreases in costs." (*Medical*

COMPLAINT     PAULY V. STANFORD HEALTH CLINICS

1  *Dictionary. (2009). Retrieved June 28, 2018 from https://medical-*

2  *dictionary.thefreedictionary.com/gainsharing ).*

3       **Defendant, SHC, designed a system which financially incentivized physicians to**

4  **deny care.** The Dean ended this section of the newsletter by stressing the importance of the new

5  model which was to begin in FY06, "I truly believe we now have hope for the future."

6       The SoM's January 29, 2007, Dean's Newsletter discussed financial results for FY 2006.

7  The newsletter stated "The School (of Medicine) ended FY 2006 with a surplus of $50 million

8  on a base of total revenues of $939 million. This compares favorably to the surplus of $20

9  million in FY2005 and a budgeted deficit of $24 million."  More importantly, the newsletter

10  states, **"Among the key contributors to the positive bottom line was the $57 million increase**

11  **in clinical revenues from the prior year, due in part to the change in the funds flow between**

12  **the School and Stanford Hospital and Clinics, and in part to the growth in the size of**

13  **clinical activities."** (emphasis added). Forcing patients to pass through the underperforming

14  outpatient clinics before coming to the hospital allowed SHC to double dip into insurance

15  companies and patients' pockets and reward the doctors who worked the system. By January 11,

16  2010, the Dean's Newsletter was looking forward to continued success, "We are currently doing

17  the planned five year review of the 'funds flow model' with SHC and are in the final stages of a

18  new 'funds flow model' with LPCH."

19       Following Defendant's denial of care, F. Pauly sought resolution through SHC's

20  nationally recognized grievance program, Process for Early Assessment and Resolution of Loss

21  (PEARL). SHC advertises the program online at Stanford Children's Health, as follows:

22  "PEARL is part of our holistic approach to your health care. We know that our patient's

23  experiences stay with them long after their care has ended."

24  (http://www.stanfordchildrens.org/en/patient-family-resources/pearl). Through the PEARL

25  program, SHC promises to address significant, unanticipated, or adverse medical outcomes,

26  "Most complications and unanticipated outcomes are not preventable. In the unusual event that

27  the outcome of your care is determined to be preventable, steps will be taken to help your family

28  recover and heal." *(Id.)* SHC denied Plaintiff's requests to participate in its advertised and

COMPLAINT       PAULY V. STANFORD HEALTH CLINICS

1   promoted PEARL program for resolution through non-litigious means, in order to conceal its

2   practice of denying necessary emergency medical care in order to advance its financial ~~scheme~~

3   objectives.

4   **D. ABUSE OF PROCESS**

5   **TENTH CAUSE OF ACTION**

6   **F. PAULY and M. PAULY-ABUSE OF PROCESS**

7   Defendant intentionally abused the judicial process for intimidation, harassment, and

8   delay, with the ultimate goal of denying Plaintiffs the right to have their cause of action heard on

9   the merits. Plaintiffs suffered extended mental and emotional distress as a result.

10  RULE 68- COERCION

11  Under this court's authority, but out of its sight, Defendant, SHC, used the court's Rule 68

12  Offer of Judgment in an attempt to extort a stipulation for dismissal with prejudice. Plaintiff's right

13  to petition the court for redress of injuries was threatened by Defendant's action, yet escaped the

14  court's scrutiny, as the offer wasn't filed with the court. In the Rule 68 Offer addressed "TO

15  PLAINTIFF M.P. AND HER ATTORNEY OF RECORD", SHC stated, "Defendant will in

16  exchange for a stipulation of dismissal with prejudice of STANFORD HOSPITAL & CLINICS

17  Pursuant to FRCP 41, waive its right to proceed with any action for malicious prosecution..."

18  Furthermore, Defendant provided a secondary threat by stating it intended to seek from Plaintiff,

19  all costs associated with its defense, "Please take notice that, if a stipulation for dismissal with

20  prejudice is not filed by the date this offer expires and Plaintiff does not then obtain a judgment

21  for monetary damage against Defendant at trial, Defendant intends to seek all expert fees and costs,

22  as well as other trial and routine costs incurred after making this offer, from Plaintiff pursuant to

23  FRCP 68 and as allowable by law." (Defendant's Offer of Judgment Pursuant to FRCP 68 No.

24  5:10-CV-05582JF, April 16, 2011 p1and 2). Defendant acted with malice and intent to deceive,

25  with full knowledge that a lawsuit for malicious prosecution was improper and that a default

26  agreement for fees and costs pursuant to this Rule 68 offer would be unenforceable.

27  Designed to promote settlements, the Supreme Court stated regarding Rule 68, "The plain

28  purpose of Rule 68 is to encourage settlement and avoid litigation...The Rule prompts both parties

COMPLAINT      PAULY V. STANFORD HEALTH CLINICS

1  to a suit to evaluate the risks and costs of litigation, and to balance them against the likelihood of

2  success upon trial on the merits. This case requires us to decide whether the offer in this case was

3  a proper one under Rule 68…" *Marek v. Chesny,* 473 U.S. 1, 5 (1985). Here, Defendant made no

4  offer at all, only a perversion of the process and an offer, or rather a threat, to not proceed with

5  actions it knew to be unlawful, in order to deny Plaintiffs' their First Amendment right to petition

6  the court. Instead of encouraging settlement, Defendant threatened further litigation.

7          Defendant's counsel at the time, Dummit, Buchholtz and Trapp (DBT), knew, or should

8  have known, the elements constituting a valid EMTALA claim, and knew the threshold for a

9  malicious prosecution suit or one to recover all costs, was not met. According to its website, "The

10  firm dates back to 1975, when it was established by Craig Dummit specifically to defend and serve

11  healthcare providers and the hospital industry." Named partner, Scott Buchholtz, highlights his

12  knowledge of EMTALA by listing three separate EMTALA presentations made to medical

13  facilities in 1999-2000. The site also boasts about its particular methods, "We attribute our success

14  to aggressive and imaginative legal defense strategies." Defendant, knowing Plaintiff was

15  proceeding *pro se,* was expedient and enclosed a "Stipulation and Order for Dismissal," with the

16  Rule 68 offer, stating "Plaintiff, FAIZA PAULY, on behalf of her minor daughter, M.P., by and

17  through her undersigned counsel, do herewith submit this Stipulation re Dismissal (the "Dismissal

18  Stipulation"). Whereas, the parties reached an agreement, wherein Plaintiff agreed to dismiss her

19  claims in consideration for a waiver of costs by Defendant, STANFORD HOSPITAL & CLINICS.

20  NOW, THEREFORE, THE PARTIES STIPULATE AS FOLLOWS: The above-entitled action is

21  dismissed in its entirety with prejudice as to Defendant, STANFORD HOSPITAL & CLINICS,

22  each party to bear its own costs. IT IS SO STIPULATED." Defendant knew that M. Pauly was

23  unrepresented by counsel and as evidence, the stipulation has only one signature line, for Plaintiff,

24  F. Pauly. Defendant assumed, that Plaintiff, as a non-attorney, would not know the difference, and

25  that the court would therefore, never know about the Rule 68 "offer."

26          This Rule 68 Offer was signed August 16, 2011, eleven days after a motion hearing where

27  Judge Fogel encouraged Defendant, for the second time, to enter into settlement talks. Judge Fogel,

28  in Order Re Motions Heard August 5, 2011, (Doc #74), stated, "As it observed at the close of oral

Page 25 of 32

COMPLAINT    PAULY V. STANFORD HEALTH CLINICS

1    argument, the Court believes strongly that this case would benefit far more from serious, good-

2    faith settlement discussion than from protracted and expensive litigation." P6

3         Defendant abused the judicial process in an attempt to fraudulently secure dismissal with

4    prejudice of Plaintiffs' lawful claims.

5    <u>SPOLIATION OF EVIDENCE</u>

6         Defendant filed a Joint Case Management Statement (JCMS) (Doc #25), dated, February

7    24, 2011, and signed by Carolyn Katzorke of DBT, stating, "The parties have agreed to make all

8    reasonable efforts to preserve evidence." P5#6. However, Defendant altered M. Pauly's medical

9    record in order to deny Plaintiffs access to evidence concerning the events giving rise to this action.

10   Plaintiffs are in possession of three separate sets of medical records concerning the date of the

11   Plaintiffs' ED visit in question:

12   **<u>Set #1 Printed on May 29, 2009</u>**

13      Printed almost 6 months after the ED visit, but prior to the filing of the first complaint.

14   **<u>Set #2 Printed on August 21, 2017</u>**

15         Requested by M. Pauly after reaching the age of majority. Records were mailed to the home

16   address as requested.

17   **<u>Set #3 Printed on May 18, 2018</u>**

18         Requested in person at SHC Medical Records Department Printed and given to Plaintiffs

19   the same day.

20   Set #1 contains:

21   -Names and activities of nurses and personnel who attended to M. Pauly while at the ED.

22   -Triage notes designating the level of Acuity at "2 Emergent".

23   -Chief complaint for coming to ED "(h)ad and appendectomy a month ago, left hospital without

24   pain being controlled, referred to pain clinic, getting worse, came to ED and went ot Sutter, had a

25   procedure which made the pain worse a 'block', burning since then and it's not stopping, original

26   pain is there, stabbing, pinching ongoing, topical cream helped, pain 10/10, not able to walk due

27   to pain."

28   -Vitals with exclamation points highlighting they were out of normal range.

COMPLAINT       PAULY V. STANFORD HEALTH CLINICS

1   -Morphine injection, time, dose, and the name of the nurse who administered it.

2   -Nurse Tiaziana Rubatto's statement, "Patient representative Jenny Booth called to talk to patient's

3   family. Family very upset about patient being discharged. MD Lipman explained (sic) family that

4   patient has excellent follow up with GI (tomorrow) and pain clinic in January. Per MD there is no

5   medical necessity for patient to stay in the hospital tonight."

6        **In sets #2 and #3, Defendants have deleted all of the above information, including the**

7   **names and actions of potential witnesses.** This altered record is currently the official medical

8   record available at SHC's records department. SHC had a responsibility to preserve the original

9   medical record and all other evidence, including transfer phone records, incident reports, etc.,

10   related to this cause of action.

11   RULE 11-MISLEADING THE COURT

12        Rule 11(1) and (2) states in relevant part "By presenting to the court a pleading, written

13   motion, or other paper…an attorney or unrepresented party certifies that to the best of the person's

14   knowledge, information, and belief… (1) it is not being presented for any improper purpose, such

15   as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims,

16   defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument

17   for extending, modifying, or reversing existing law or for establishing new law." In direct violation

18   of Rule 11(b)(1) and (2), Defendant, knowingly submitted to this court, false and misleading

19   information, with the intent to intimidate Plaintiff, cause unnecessary delay and move the court to

20   dismiss Plaintiffs claims.

21   Rule 11(b)(1): False Classification of Plaintiff as Third Party:

22        Defendant misled the court regarding Plaintiff, F. Pauly's classification as a third party in

23   its Motion to Dismiss (MTD), dated January 12, 2011 (Doc.#5), in order to state that the issue of

24   third party standing was one of first impression for the courts, and wrongly direct the court to two

25   district court cases outside the Ninth Circuit as persuasive. In fact, California District courts and

26   the Ninth Circuit had reviewed the issue of nonpatient standing in EMTALA prior to the present

27   case, (*see Kilcup v. Adventist* 57 F.Supp.2d 925 (1999), *Jackson v. East Bay Hosp.* 246 F.3d 1248

28   (2001)) and found that nonpatients do have standing. Plaintiffs have submitted a Memorandum of

Page 27 of 32

COMPLAINT     PAULY V. STANFORD HEALTH CLINICS

1    Points and Authorities in Support of Nonpatient Standing in EMTALA (Memorandum) to expand

2    and clarify the issue more thoroughly.

3         Defendant succeeded in dismissing Plaintiff, F. Pauly's claim, and in addition, creating

4    case law that limits its liability for any future violations of EMTALA, to the patient only, if the

5    patient lives. Defendant's counsel also benefited, as the industry it represents is no longer liable to

6    anyone but the patient, if that patient lives.

7    Rule 11(b)(1): Falsely Citing Authoritative Precedent:

8         Defendant cited case law in support of its MTD, stating, "Where the complaint reveals on

9    its face that plaintiff lacks standing to sue, a motion to dismiss for failure to state a claim will lie.

10   *Holly Sugar Co V. Goshen Co. Cooperative Beet Growers Ass'n* (10th Cir. 1984) 725 F. 2d 564,

11   567-658." P2. Defendant fails to quote the opinion directly, but at the location provided, contrary

12   to Defendant's objective, the case specifically supports standing for plaintiffs and the entire

13   opinion lacks any mention of the words 'motion to dismiss'. More importantly, were it possible

14   to somehow infer Defendant's comment from elsewhere in *Holly,* the legal proposition that

15   standing must be evident on the face of the complaint, is contrary to Rule 9(a), which states,

16   "Capacity or Authority to Sue: Legal Existence. (1) In General. **Except when required to show**

17   **that the court has jurisdiction, a pleading need not allege: (A) a party's capacity to sue or**

18   **be sued."** Defendant filed a Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim,

19   therefore, it is the *claim*, not Plaintiffs standing, which requires facial plausibility.  Defendant

20   succeeded however, in removing the complaint before the court had addressed the question of

21   whether Plaintiff's claim had facial plausibility. Additionally, Defendant's claim regarding

22   standing is not supported by law, and is in direct contradiction to the Supreme Court's

23   authoritative precedent regarding the zone of interest as it relates to statutory standing. (*see;*

24   *Thompson v. North American Stainless, LP,* 562 U. S. 170 (2011), *Lujan* v. *National Wildlife*

25   *Federation,* 497 U. S. 871, 883 (1990), *National Credit Union Admin.* v. *First Nat. Bank & Trust*

26   *Co.,* 522 U. S. 479, 495. Plaintiff addresses this issue more thoroughly in the attached

27   Memorandum.

28

COMPLAINT      PAULY V. STANFORD HEALTH CLINICS

Rule 11(b)(2): Defenses Not Warranted by Existing Law

Defendant's Answer to Plaintiff's Second Amended Complaint (Doc. #66), filed on August 9, 2011, contains defenses known by Defendant to be unwarranted by existing law. For example, Defendant claimed several Affirmative Defenses which stated that Defendant was not responsible for any actions or damages due to; Plaintiffs' contributory negligence (#2,3,4), assumption of risk (#7), and public policy (#8). Defendant was aware that the law did not support such defenses. Defendant's Chief Risk Management Officer, Jeffrey Driver, made public statements, in an article dated June 1, 2004, entitled, *Pony Rides Definitely Need a Waiver of Liability,* admitting that fact: "Liability waivers, or agreements, to settle a case in mediation, are most appropriate for elective procedure in which the patient has been well informed of any risks and has the ability to forgo the procedure without any adverse effects, Driver says. '**So they're not going to be of much use in your emergency room**'…Liability waivers also are useful in health care settings for situations other than treating patients, Driver says…'[P]ony rides are not in the public interest, and there's no unfair bargaining. It's a dollar a ride and you have to agree not to sue us,' he says, '**But when you come to the emergency room, you have to come here for help, and it's a service in the public interest.** That's the dividing line on enforceability.'" (*www.ahcmedia.com/articles/4983-pony-rides-definitely-need-waiver-of-liability*) (emphasis added). Defendant listed twenty affirmative defenses with the intent to cause delay, intimidate and harass Plaintiffs, forcing them to answer defenses it knew were contrary to law.

Violation of Agreement to Stay Discovery

In the JCMS (Doc #25), dated February 24, 2011, Defendant stated, "No discovery has yet commenced. The Parties will refrain from conducting discovery until after the initial Case Management Conference." P5#8. (The CMC never occurred in this action, as it was continued until the action was dismissed). Defendant then proceeded on August 10, 2011, to subpoena Sutter Hospital for ALL medical records related to M. Pauly, to be produced on August 31, 2011. Defendant had refused to see the medical records, prepared by Sutter Hospital and presented by F. Pauly on December 10, 2008, when she arrived at Defendant's Emergency Department seeking medical care. Furthermore, Defendant had previously sought Plaintiff, F. Pauly's

COMPLAINT     PAULY V. STANFORD HEALTH CLINICS

permission to request M. Pauly's medical records from Sutter while investigating Plaintiff's complaint in 2009. F. Pauly had denied that request, as those records were immaterial to the question of whether Defendant, SHC, had failed to provide emergency medical care as required by EMTALA, and those records were private, belonging to her daughter and protected by law. The fact that the Sutter records were immaterial is evident by the statements made by Carolyn Katzorke in her Declaration dated August 1, 2011, (Doc #65), wherein she stated the needed to depose, among others, Sutter Memorial Hospital, in order to: "...discover the following facts, specifically including, but not limited to: a. Whether minor, M.P., had an emergent medical condition on December 10, 2008...b. Whether, SHC provided minor, M.P., with an appropriate medical screening examination, within the capabilities of its Emergency Department on December 10, 2008...c. Whether SHC's actions on December 10, 2008 were a substantial factor in causing minor, M.P., personal injuries; and d. Whether minor, M.P., sustained personal injuries as a result of any conduct of SHC." Clearly, none of the facts Defendant was trying to ascertain had anything to do with Sutter or its records, therefore, they were not immaterial, as all of these questions could be answered by Defendant's records dated, December 10, 2008. EMTALA states, excluding transfer requests, a hospital's obligations start "[w]hen any individual...**comes to a hospital**." §1395dd(b)(1). (emphasis added). Defendant knew that EMTALA is not a medical malpractice cause of action but went on a fishing expedition to find someone to blame for its blatant and expansive violations of EMTALA. It did this after filing an agreement with the court to stay discovery until after the CMC. Plaintiff filed a Motion for Temporary Protective Order and For Temporary Stay of Discovery Pending Representation of Minor by Counsel," (Doc #68) on August 24, 2011, in an attempt to stop Defendant from obtaining Sutter's records. The court declined to respond to Plaintiff's Motion. Plaintiffs are unaware if Defendant is in possession of M. Pauly's Sutter Hospital medical records.

**10. Damages**

**Civil Enforcement -Personal Injury**

"Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital,

COMPLAINT     PAULY V. STANFORD HEALTH CLINICS

obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate." 42 USC §1395dd(d)(2)(A)

**Exemplary Damages**

In addition to Compensatory Damages, California provides for Exemplary Damages in California Civil Code §3294(a). This court held, "[C]onclusory assertions that the defendants acted with 'malice' or with 'conscious disregard' for plaintiff's rights are facially sufficient under federal pleading requirements and adequate to state a claim for punitive damages under Section 3294." *Clark v. Allstate Ins. Co.*, 106 F. Supp. 2d 1016, 1019 (2000) (citations omitted).

**11. Request**

Wherefore, each Plaintiff requests judgment against Defendants as set forth below:

A. General Damages

Plaintiffs, individually, request $500,000 per cause of action.

B. Punitive Damages

Plaintiffs, individually, request damages in the amount appropriate to punish Defendant and deter others from engaging in similar wrongful conduct.

C. Abuse of Process

Plaintiffs respectfully request that the court assign appropriate remedies for this cause of action at its discretion.

D. Such other relief which may be authorized under other causes of action.

E. Such other relief that the court deems appropriate.

F. Request for Preservation of Evidence and the Judicial Process

Plaintiffs respectfully request that the court, at the onset of the case, prohibit Defendant from further destroying or altering evidence, including but not limited to: Medical records, transfer phone records, any communication between Sutter Hospital and Defendant, relevant peer review records, employment records of any physician or other employee involved in the events of this case, and any other relevant evidence. Plaintiffs also respectfully request that the court prohibit Defendant from engaging in any further abuse of the judicial process with respect to this case.

COMPLAINT     PAULY V. STANFORD HEALTH CLINICS

PLAINTIFFS HEREBY DEMAND JURY TRIAL

Date: 8/31/18

Sign Name: _Makenzie Pauly_

Print Name: Makenzie Pauly

Plaintiff, pro se

Sign Name: _Faiza Pauly_

Print Name: Faiza Pauly

Plaintiff, pro se

COMPLAINT     PAULY V. STANFORD HEALTH CLINICS