UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAKENZIE PAULY,<br><br>  Plaintiff,<br><br>  v.<br><br>STANFORD HEALTH CARE,<br><br>  Defendant. | Case No. 18-cv-05387-SI<br><br>**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 163, 175 |

Before the Court are defendant Stanford Health Care's (SHC) motion for summary judgment and plaintiff Makenzie Pauly's cross-motion for summary judgment. Dkt. Nos. 163, 175. This lawsuit arises out of defendant's alleged failure to screen and treat plaintiff in violation of the Emergency Medical Treatment & Labor Act (EMTALA), 42 U.S.C. § 1395dd. Dkt. No. 1 at 4. For the reasons discussed below, the Court **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiff's cross-motion for summary judgment.

# BACKGROUND

### A. Factual Background

On November 7, 2008, when Pauly was approximately ten years old, she saw Dr. Gates at Sutter Hospital (Sutter) for abdominal pain she had been suffering for two months. *Id.*; Dkt. No. 165-6 at 5. She had received a "significant workup" including ultrasound, colonoscopy, esophagogastroduodenoscopy, and CT scan, all of which were negative. *Id.* at 5–6. After a physical examination, *id.* at 6, Dr. Gates performed a diagnostic laparoscopy and removed Pauly's appendix. *Id.* at 239–40. Dr. Gates reported no complications. *Id.* at 241. An MRI was conducted; no intracranial mass, hematoma, acute infarct, or enhancing lesions were found. *Id.* at

259. On November 11, 2008, Pauly was discharged from Sutter with medication and instructions to follow up in 7–10 days. *Id.* at 179–80. Her record noted that the family planned to call SHC "to see if they can be evaluated by their team." *Id.* at 179–80.

On November 14, 2008, Pauly's mother took Pauly to the SHC emergency room for abdominal pain after the surgery. Dkt. No. 165-1 at 3–8. Her medical history was obtained, her vitals were taken by nursing, and she saw Dr. Stephanie Doniger for a physical exam. *Id.* at 6–9. Dr. Doniger made a differential diagnosis "includ[ing] but not limited to post-op abscess (s/p neg appendectomy) vs gallbladder pathology (cholecystitis/cholelithiasis) vs UTI vs functional AP vs constipation vs abdominal migraines vs post-op pain." *Id.* at 9. Pauly was given morphine and was evaluated with several labs and an ultrasound. *Id.* at 11–18. The ultrasound showed a small amount of gallbladder sludge but was otherwise normal. *Id.* at 16–21. Pauly was given more pain medication later that night. *Id.* at 22–23. She left in stable condition with a prescription for Vicodin and instructions to return in the case of persistent vomiting, intolerance to liquids, or unbearable pain not controlled with Vicodin. *Id.* at 5, 31. On November 17 a nurse spoke with Pauly's mother about a positive urine culture and a doctor sent a prescription for Augmentin. *Id.* at 6.

On December 4 Pauly returned to Sutter reporting "persistent abdominal pain … different in nature from the pain she originally presented with." Dkt. No. 165-2 at 16. She again saw Dr. Gates, who treated her on December 5 with a bupivacaine injection that "caused her excruciating pain." *Id.* 12. Dr. Gates sought a consultation by Dr. Falco, whose assessment notes indicate "nonspecific abdominal pain that despite a very extensive workup has no organic etiology" and a normal heart rate despite high pain levels. *Id.* at 18–19. Dr. Falco recommended "more intensive psychiatric therapy" and "agree[d] with getting a pain consultation from UC Davis and/or transferring her to Stanford where there is a more extensive pain/psychiatric service." *Id.* A consult was also performed by Dr. McDonald, who noted an "extremely extensive workup" with all labs and testing negative. *Id.* at 20–21. Dr. McDonald assessed Pauly as having "chronic abdominal pain," recommended an MRI of the spine in case of a tumor, and noted Pauly's mother was "interested in a pain clinic in Stanford." *Id.* at 21. In discharge notes Dr. Gates noted Pauly's

pain was "inconsistent" with her abdominal examination and heart rate and suggested a "nonorganic etiology for her abdominal pain." *Id.* at 14–15.

Dr. Gates' notes also indicate he sought an inpatient referral to SHC's pain clinic, "but they refused admission unless she failed their outpatient pain management service." *Id.* at 14–15. Notes from December 7 indicate Pauly was "awaiting bed avail – Sford" but "no bed avail today" and stated intent to transfer "to Stanford as soon as bed avail." *Id.* at 68. Notes from December 8 again mention a possible "transfer to Stanford peds." *Id.* Notes from December 9 indicate an attempt to transfer her to SHC: "try to get her to Stanford pain clinic." *Id.* at 67. Notes from December 10 indicate that doctors at Sutter were trying to transfer Pauly to SHC when a bed became available: "cont [illegible] bed avail @ Stanford," *id.* at 65; "Waiting for Stanford pain clinic," *id.*; "cont. @ current Doc. Tx to Stanford when bed avail," *id.* at 66; "P awaiting bed @ Stanford." *Id.*

Notes from SHC's transfer log show that they had no beds available on December 7 but recommended calling back the next day. Dkt. No. 166-6 at 3. Notes from December 8 note no beds available "and not sure if they want to take pt." *Id.* Notes from December 10 state, "There is nothing that LPCH has to offer at this time bed control is aware." *Id.*

On December 10, after Pauly was discharged from Sutter, her mother took her to SHC's emergency room. Dkt. No. 165-1 at 44. Pauly reported her pain was a 10/10 and a procedure at Sutter had made the pain worse. *Id.* at 47. Nursing notes indicate Pauly had been in pain for a month and been seen at numerous hospitals for pain control without relief. *Id.* at 48.

Nurses triaged Pauly and then performed a nursing assessment. *Id.* at 60–62. Topical cream and morphine were administered. *Id.* at 58–59. Pauly's vitals were taken again.

Pauly was seen by Dr. Grant Lipman, who received a medical history from Pauly's mother. *Id.* at 50. The medical history included her laparoscopy in November and hospitalization at Sutter. *Id.* Dr. Lipman noted the pain "started at the end of August and continued despite negative workup." *Id.* Dr. Lipman noted "severe" pain not relieved by anything but "no anorexia, no diarrhea, no hematuria, no fever, no nausea, no vaginal bleeding, no cough, no vomiting, no vaginal discharge, no headaches, no constipation, no dysuria and no rash." *Id.* Dr. Lipman also

noted Pauly was seen by "psych at Sutter Hospital to [rule out] somatoform disorder." *Id.*

Dr. Lipman conducted a physical examination including palpation of Pauly's abdomen. *Id.* at 51–52. He consulted pain services, which said they would not "admit/consult unless medically indicated or seen as outpatient first." *Id.* at 52. He made a differential diagnosis of "Chronic pain symptom v neuropathic pain v abdominal migraines v malingering." *Id.* His notes on patient progress and condition on discharge state: "Stable 8:17 PM." *Id.* He also noted Pauly's mother was uncomfortable with leaving and would follow up as an outpatient with pain services. *Id.* at 53. He noted at 9:10 p.m. that the patient was refusing to sign discharge papers, was "demanding admission for diagnostics" despite over 5 weeks of similar symptoms, and had a "good" follow-up scheduled in the morning. *Id.*

From Pauly's perspective, the visit was stressful and perfunctory. Pauly submitted a declaration stating that she was "in severe pain" and unable to walk at the emergency department and that the doctors were angry she had come and refused to admit her or treat her pain. Dkt. No. 175-1 ¶¶ 12–14. She states that the examination was rude and harsh and Dr. Lipman "treated [her] like a nuisance." *Id.* ¶ 15. She states that on-call specialists refused to come in and she was discharged without stabilizing treatment despite her mother's insistence that she stay for the night. *Id.* ¶¶ 15–18. She was traumatized by the experience and in severe pain for five more weeks. *Id.* ¶¶ 21–23, 27. She used a wheelchair during that time due to the pain. *Id.* ¶ 25.

Pauly saw a naturopathic doctor, Dr. Suzanne Wang, the next day. *Id.* ¶ 22. Pauly believes her condition was caused by a myotoxic reaction to the bupivacaine she was administered at Sutter. *Id.* She applied a topical cream "for about a week and the pain finally resolved five weeks" after the visit to SHC. *Id.*; Dkt. No. 167-2 at 44:9–14. In a deposition Pauly's mother stated Pauly had no ongoing impairment to her bodily functions. *Id.* at 44:15–18.

**B. Procedural History**

Following an attempt by plaintiff's mother to file suit on plaintiff's behalf while plaintiff was a minor, plaintiff and her mother filed the instant action on August 31, 2018. Dkt. No. 1; *see* Case No. 3:10-cv-05582-SI (prior case). Defendant moved to dismiss on September 27, 2018,

4

and the Court dismissed all claims except Pauly's EMTALA claims. Dkt. No. 32. Pauly brings four EMTALA claims: (1) that SHC failed to accept her in transfer, violating EMTALA's "reverse-dumping" provisions; (2) that SHC failed to provide an appropriate medical screening exam; (3) that SHC on-call specialists failed to appear when called to perform services; and (4) that SHC failed to treat Pauly's emergency medical condition. Dkt. No. 1 at 9–17.

Defendant moved for summary judgment or partial summary judgment on July 22, 2022. Dkt. No. 163. Plaintiff included a cross-motion for summary judgment in her response to defendant's summary judgment motion, which the Court has accepted despite being late filed. Dkt. No. 175 (opposition and cross-motion for summary judgment); Dkt. No. 200 (order).

SHC seeks full or partial summary judgment on the following bases: (1) that EMTALA's stabilization requirement does not apply because there was no emergency medical condition; (2) plaintiff's "reverse dumping" claim fails because there was no capacity at LPCH and LPCH is a separate legal entity from SHC; (3) SHC provided appropriate medical screening; (4) there was no violation related to on-call specialists; (5) there was no failure to stabilize plaintiff; (6) SHC did not cause any injury or deterioration to plaintiff; and (7) MICRA damages limitations apply. Dkt. No. 163.

Pauly also requests summary judgment on all counts, arguing that she has provided undisputed evidence that proves each claim. Dkt. No. 175.

A hearing was held on September 16, 2022. Dkt. No. 213.

**LEGAL STANDARD**

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party makes an initial showing "that there is an absence of evidence to support the non-moving party's case," the nonmoving party must then provide evidence "showing that there is a genuine issue for trial." *Id.* at 324. "When the moving party has carried its burden under Rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material

5

facts .... [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586–87 (1986) (citation and internal quotation signals omitted). Summary judgment must be denied if "a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

Congress enacted EMTALA out of "concern[] that hospitals were 'dumping' patients who were unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1255 (9th Cir.1995). EMTALA has a screening requirement, a stabilizing treatment requirement, and a transfer nondiscrimination requirement. 42 U.S.C. § 13955. The screening requirement obligates a hospital to "provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists" when a person comes to the hospital's emergency department seeking treatment or examination. 42 U.S.C. § 1395dd(a). The stabilizing treatment requirement mandates that if a person comes to a hospital and the hospital determines that person has an emergency medical condition, the hospital must provide either

> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>
> (B) for transfer of the individual to another medical facility in accordance with subsection (c).

42 U.S.C. § 1395dd(b)(1). The term "to stabilize" is defined as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" 42 U.S.C. § 1395dd(e)(3)(A).

The transfer nondiscrimination requirement prohibits hospitals with specialized capabilities from "refus[ing] to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual." 42 U.S.C. § 1395dd(g).

## DISCUSSION

**A. Pauly's motion to strike SHC's arguments is denied.**

As a preliminary matter, Pauly moves to strike SHC's arguments because they "fall out side of the relevant time, scope, and subject matter of the present case." Dkt. No. 175 at 2–5. Pauly argues that SHC improperly includes evidence from before Sutter's request for a transfer on December 7, 2008 and after SHC discharged Pauly from the emergency department on December 10, 2008. *Id.* at 2. She also argues that SHC improperly includes evidence of medical events not available to SHC at the time.

The Court does not find reason to strike SHC's arguments. Evidence of Pauly's medical history prior to the transfer request is relevant to the extent SHC knew that medical history and it factored into SHC's examination and decision not to admit Pauly. Although Pauly argues that SHC "refused to take or review the paperwork" Pauly's mother brought to SHC from Sutter, Dkt. No. 175 at 8, the evidence shows SHC was aware of and involved in Pauly's medical care well before December 7. SHC and Sutter were in communication concerning Pauly's potential transfer. Dkt. No. 165-2 at 14–15, 66–68. Pauly's mother signed a declaration stating that she took Pauly to SHC's emergency department on November 11, 2008, where they examined and treated her for her abdominal pain and that on December 10, Dr. Murtaugh took Pauly's history. Dkt. No. 175-2 at ¶¶ 12-14, 38. Contemporaneous notes by Dr. Lipman on December 10 show that he was aware of Pauly's history of abdominal pain going back to August 2008 and that Pauly's mother provided medical history to him. Dkt. No. 165-1 at 50. Information known to SHC at the time was relevant to the adequacy of examination and stabilizing care SHC provided Pauly.

Evidence of Pauly's condition before and after she was seen at SHC is also relevant to show whether Pauly was suffering from an emergency medical condition, including whether her condition was acute or chronic, whether she was stabilized, and whether SHC's conduct caused injury to her. *See* 42 U.S.C. § 1395dd(b)–(e).

Pauly also argues SHC's arguments should be stricken because they do not have support in

7

the record. Dkt. No. 175 at 10. This argument is unavailing; the merits of SHC's arguments and the evidence in support are discussed more fully below.

**B. Summary judgment is granted in SHC's favor on Pauly's first cause of action because there were no beds available to admit Pauly as a transfer.**

Pauly's first cause of action alleges SHC violated the "reverse dumping" provision of EMTALA by failing to accept a transfer request from Sutter to the Louise Packard Children's Hospital (LPCH). Dkt. No. 1 at 9–12. EMTALA's "reverse dumping" provision requires that a hospital with specialized capabilities must not refuse "an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual." 42 U.S.C. § 1395dd(g); *see* Dkt. No. 1 at 9–12. Among other requirements, EMTALA defines an "appropriate transfer" to require that the receiving facility "(i) has available space and qualified personnel for the treatment of the individual, and (ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment." 42 U.S.C. § 1395dd(c)(2)(B).

SHC argues Pauly cannot meet her burden on this claim because (1) a transfer would not meet the requirements of subsection (c)(1)(A) of EMTALA, (2) any attempted transfer was not an "appropriate transfer" under subsection (c)(2)(B) of EMTALA because LPCH had no beds available and could not provide specialized treatment, and (3) LPCH is a separate legal entity from SHC and therefore SHC is not liable for LPCH's alleged failure to comply with EMTALA.

SHC's argument that subsection (c)(1)(A) is not met is irrelevant. Subsection (c)(1)(A) places requirements on the transferring hospital, not the hospital receiving the transfer. Sutter's potential liability under subsection (c)(1)(A) is not at issue.

However, summary judgment is warranted on the basis that LPCH did not have the capacity to admit Pauly. Dkt. No. 163 at 15. This argument is supported by Exhibit F, a transfer log reflecting a transfer request made by Dr. Gates for Pauly from Sutter to LPCH on December 7, 2008 and December 10, 2008. Dkt. No. 166-6 at 1. An entry for December 7, 2008 at 13:32 states, "As of now there are no beds for the pt. Dr. Lin advised of some medication to try. She

8

United States District Court
Northern District of California

1    also said that the referring could call back tomorrow if inpt stay is needed." *Id.* at 3. An entry for
2    December 8, 2008 at 16:33 states, "Per Mosley will follow up tomorrow, no beds and not sure if
3    they want to take pt." *Id.* And an entry for December 10, 2008 at 10:03 states, "Per MD
4    conversation. There is nothing that LPCH has to offer different at this time bed control is aware."
5    *Id.* Pauly's medical records from Sutter also indicate that there were no beds available as of
6    December 10. Dkt. No. 165-2 at 66–68. These statements support SHC's argument that there was
7    not capacity to take in Pauly as a transfer.

8    Pauly does not provide any evidence that SHC had available beds, and at the September 16
9    hearing she admitted that she has no such evidence. She argues that SHC did not provide any
10   evidence and that capacity includes "whatever a hospital customarily does to accommodate
11   patients in excess of its occupancy limits." Dkt. No. 175 at 21. But she does not provide any
12   evidence that LPCH customarily accommodates patients in excess of its occupancy limits. *See id.*
13   She does provide declarations by herself and her mother indicating there were other reasons for
14   Stanford to refuse her, but no evidence that there actually were beds available. Dkt. No. 175-1
15   ¶ 10; Dkt. No. 175-2 ¶ 27.

16   Even if LPCH had other reasons for refusing Pauly, a lack of available space at LPCH
17   defeats Pauly's anti-dumping claim because subsection (g) of EMTALA applies only "if the
18   hospital has the capacity to treat the individual." 42 U.S.C. § 1395dd(g). Further, subsection (g)
19   applies only in the case of an "appropriate transfer," which is statutorily defined to require that the
20   "receiving facility . . . has available space." 42 U.S.C. § 1395dd(c)(2)(B)(i). Because there is
21   unrebutted evidence LPCH did not have available space, subsection (g) of EMTALA does not
22   apply.

23   Because there is no evidence that an appropriate transfer could be made, the Court does not
24   reach SHC's argument that SHC and LPCH are separate legal entities. Dkt. No. 163 at 15.

**C. The Court grants SHC's motion for summary judgment with respect to the second claim because SHC has provided evidence that Pauly's medical screening examination was appropriate and Pauly has failed to rebut that evidence.**

Pauly's second claim is for failure to provide an appropriate medical screening examination as required by subsection (a) of EMTALA. Dkt. No. 1 at 12–13; *see* 42 U.S.C. § 1395dd(a). The medical screening examination requirement is met if the hospital "provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not 'designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury.'" *Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1256 (9th Cir. 2001) (quoting *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1257 (9th Cir. 1995)). Correct diagnosis is not required. *Id.* at 1255–56.

Pauly alleges that the screening examination was inadequate because it took 33 minutes, the examining doctors were "visibly angry" that Pauly had come to the emergency department, Pauly was denied admission until she failed the outpatient clinic, and Pauly's attending physician specialized in "Wilderness Medicine" rather than pediatric care. Dkt. No. 1 at 12– 15.

SHC argues that its emergency screening met the standard of care. Dkt. No. 163 at 16. SHC refers to Exhibit N, a declaration by Dr. Hugh H. West, a physician specializing in emergency medicine who reviewed Pauly's medical records and several depositions and pleadings and concluded that an appropriate medical screening was provided. Dkt. No. 167-5 at 12. SHC also points to Pauly's statements in a deposition, in which she said her examination on December 10 was inferior to her examination on November 14 but admitted that she didn't remember specifics and has no other evidence she did not receive the same examination as patients the same age with the same condition. Dkt. No. 187-1 at 34:19–36:25. In the same deposition, Pauly admitted that on December 10, her bowel sounds were listened to, her abdomen was touched, she had an extensive medical history taken concerning her abdominal pain, she had lab studies run, she had a urinalysis performed, and she received pain medication. *Id.* at 274:24–275:11. She believed the exam was cursory because they did not "help [her]," but she could not identify specifically what they should have done. *Id.* at 275:12–277:7. Pauly's medical records indicate

10

after nurses conducted triage, the examining doctor took a detailed medical history and examined her, including palpating her abdomen. Dkt. No. 165-1 at 50–51.

Pauly responds that "the undisputed facts show that Plaintiff was treated differently than other pediatric pain patients and denied emergency medical care" but does not provide any evidence in support of this contention. Dkt. No. 175 at 23. Pauly is not calling any expert witnesses. *Id.* at 175. She provides a declaration stating that she was examined "in a very rude manner" that included "pressing [Pauly's] abdomen in harsh ways to 'test' if [Pauly] was manufacturing the pain." Dkt. No. 175-1 at ¶15. She also provides a declaration from her mother stating that the Pauly was triaged by a nurse, had her blood taken, and was given a shot of morphine but that the doctors were angry and did not want to treat Pauly and that Dr. Lipman "briefly and casually examined [Pauly's] abdomen while looking at [Pauly's mother] to see if she was faking the pain." Dkt. No. 175-2 at ¶¶36–47.

Pauly has provided evidence that the examining physician was rude and did not want to deal with her, but she has not provided any evidence that the examination conducted was inconsistent with that provided to other patients or so cursory it was not designed to identify an emergency medical condition. *Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1256 (9th Cir. 2001). The EMTALA standard is an appropriate medical screening exam, not one which satisfies the patient or successfully identifies the source of the patient's symptoms. *Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1255 (9th Cir. 2001) (quoting *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1139 (8th Cir.1996) (en banc)) ("[W]e hold that instances of 'dumping' or improper screening of patients for a discriminatory reason, or failure to screen at all, or screening a patient differently from other patients perceived to have the same condition, all are actionable under EMTALA. But instances of negligence in the screening or diagnostic process, or of mere faulty screening, are not."). Because SHC has provided substantial testimony, including an expert witness, to show that the examination was adequate, and Pauly has not provided any relevant evidence in rebuttal, summary judgment is granted for SHC.

///

### C. Summary judgment is granted to SHC on plaintiff's third claim because the claim is based on a section of EMTALA that does not create a separate cause of action.

Pauly's third claim is that SHC violated EMTALA by failing to provide on-call specialists. Dkt. No. 1 at 15-16. EMTALA states:

> If, after an initial examination, a physician determines that the individual requires the services of a physician listed by the hospital on its list of on-call physicians (required to be maintained under section 1395cc(a)(1)(I) of this title) and notifies the on-call physician and the on-call physician fails or refuses to appear within a reasonable period of time, and the physician orders the transfer of the individual because the physician determines that without the services of the on-call physician the benefits of transfer outweigh the risks of transfer, the physician authorizing the transfer shall not be subject to a penalty under subparagraph (B). However, the previous sentence shall not apply to the hospital or to the on-call physician who failed or refused to appear.

42 U.S.C. § 1395dd(d)(1)(C). Pauly alleges this provision was violated when Dr. Lipman called the pain team and they stated they would "not admit/consult unless medically indicated or seen as outpatient first." Dkt. No. 1 at 16. Pauly further alleges that on December 10, SHC contacted two on-call specialists who refused to come and consult. *Id.* SHC argues that this provision does not form the basis of a new EMTALA claim and even if it could, the on-call physicians appropriately determined there was no need to admit Pauly as an inpatient. Dkt. No. 163 at 17–18.

SHC's reading of the statute is correct. Subsection (d) of EMTALA is titled "enforcement" and lays out the penalties for a violation of EMTALA. 42 U.S.C. § 1395dd(d). Subsection (d)(1)(B) lays out the penalties for a physician who negligently violates a requirement of EMTALA. 42 U.S.C. § 1395dd(d)(1)(B). Subsection (d)(1)(C) carves out an *exception* to those penalties for a physician who seeks the assistance of on-call physicians, does not receive that assistance, and then transfers the patient after determining that the benefits of a transfer outweigh the risks. 42 U.S.C. § 1395dd(d)(1)(C). It does not create a separate cause of action. SHC's motion for summary judgment on the third cause of action is granted.

///

### D. SHC's motion for summary judgment on the fourth claim is granted because no emergency medical condition was detected.

Pauly's final claim is failure to stabilize. SHC argues that EMTALA's stabilization requirement does not apply in this case because the hospital had not detected an emergency medical condition, that there was no failure to stabilize her, and that in any case SHC did not cause any injury to Pauly. Dkt. No. 163 at 13, 19–20.

EMTALA requires stabilizing treatment "if any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition." 42 U.S.C. § 1395dd(b)(1). "Emergency medical condition" is defined in relevant part as:

> "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--
>
>> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>>
>> (ii) serious impairment to bodily functions, or
>>
>> (iii) serious dysfunction of any bodily organ or part . . . ."

42 U.S.C. § 1395dd(e)(1)(A). SHC argues that plaintiff did not suffer any acute symptoms and that there was no reasonable expectation that failure to provide immediate medical attention could reasonably be expected to result in serious jeopardy, impairment to bodily functions, or dysfunction. Dkt. No. 163 at 13.

Pauly counters that the screening exam "was designed to IGNORE the acute and severe symptoms that Plaintiff displayed." Dkt. No. 175 at 14 (emphasis original). She argues that SHC's own definition of "emergency medical condition" includes "severe pain of any nature" and that she "did in fact have an emergency medical condition that had already resulted in serious dysfunction of a body part because she was unable to walk." *Id.* EMTALA provides that severe pain is an emergency medical condition when the symptoms are acute and absence of immediate medical attention could reasonably be expected to result in serious jeopardy to an individual's health, serious impairment to bodily functions, or serious dysfunction of a bodily organ or part. 42 U.S.C. § 1395dd.

13

The duty to stabilize only arises once a hospital has "actual knowledge" of an emergency medical condition. *Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1257 (9th Cir. 2001). Pauly's argument that the examination was designed to ignore her symptoms goes to her screening argument, not whether an emergency condition was detected. *See id.* at 1255–56. The relevant fact question is whether the hospital had actual knowledge of acute symptoms and the reasonable expectation that those symptoms would result in serious jeopardy, impairment of bodily functions, or dysfunction. *Id.* at 1257.

It is clear from the evidence that SHC had actual knowledge Pauly was in severe abdominal pain. Her medical records indicate she reported "pain 10/10," was positive for abdominal pain, "appears distressed," and is "crying out in pain." Dkt. No. 165-1 at 47, 51. But there is no evidence that the hospital determined her to have acute symptoms of sufficient severity that denying her treatment would seriously jeopardize her health, impair her bodily functions, or cause serious dysfunction of a body part. 42 U.S.C. § 1395dd(e)(1)(A). Her doctors noted the pain had lasted longer than a month, there was no diagnosis despite multiple procedures and admissions, and she was stable. Dkt. No. 165-1 at 52. Pauly has offered no evidence to rebut SHC's evidence that her doctors did not consider her to have an emergency medical condition. Because there is no evidence SHC had actual knowledge of an emergency medical condition, Pauly's stabilization claim fails.

### E. Remaining issues

Because summary judgment is granted in SHC's favor on all counts, the Court need not reach SHC's arguments concerning causation or limitation of damages.[1] For the reasons discussed above, Pauly's motion for summary judgment is denied.

---

[1] At the hearing on September 16, Pauly argued that her lay testimony should be sufficient to show causation and damages under *Scott v. Mem'l Health Care Sys., Inc.*, 660 F. App'x 366 (6th Cir. 2016). Because this order need not reach causation and damages, the Court does not opine on whether lay testimony would be sufficient to prove causation in this case.

14

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby **GRANTS** SHC's motion for summary judgment in full and **DENIES** Pauly's cross-motion for summary judgment. This action is therefore **DISMISSED**.

**IT IS SO ORDERED**.

Dated: September 29, 2022

_____
SUSAN ILLSTON
United States District Judge